| 36 | 476 |
| 138 | 615 |
| 36 | 476 |
| 201 | 496 |
| 36 | 476 |
| 23 SC | 555 |

## Anderson's Appeal.

Under the Act of 11th April 1848, a widow who elects not to take under her husband's will, is entitled to one-third or one-half, as the case may be, of the personal estate, in the same manner as if he had died intestate.

The Act of 29th March 1832, gives the widow twelve months to make her election, and before the expiration of that time, she cannot be called on by any person or tribunal to say whether or not she will accept the provision made for her by the will, or take her dower in the lands and her share of the personal estate.

Where the widow on being cited to make her election, declines to take under the will, and claims her dower and share of the personal estate, a party asserting a previous election to take under the will, must prove it by clear and positive testimony, and show that such election was made with a full knowledge of her rights.

An election by matter *in pais* can only be determined by plain and unequivocal acts, under a full knowledge of all the circumstances, and of the party's rights: one is not bound to elect, until he is fully informed of the relative value of the things he is to choose between; and if he make an election, before the circumstances necessary to a judicious and discriminating choice are ascertained, he will not be bound.

APPEAL from the Orphans' Court of *Montgomery county*.

This was an appeal by Mary W. Anderson, the widow of Dr. James Anderson, deceased, from the decree of the court below, rejecting her claim to dower in the estate of her deceased husband, and distributing his personal estate.

Dr. James Anderson died on the 1st June 1858, and by his will devised as follows:—"I give and bequeath unto my present wife Mary, during her natural life, the interest of the sum of five thousand dollars, the interest to be paid to her every six months; I also leave to her, during the same period of time, all of the lands which I now own or may yet be the owner of in Montgomery county, Pennsylvania, together with all of the personal and movable property pertaining to the lands and buildings thereon erected, to be managed and used by her in the following manner: She first reserving for her own convenience and comfort what she may need; the remainder of the real and personal property to be rented by her to my two sons, John Fletcher and Ultimus Adjutor, or to either one of them, as may be thought most advisable. After their mother's decease, the title to the real and personal estate above alluded to, to be vested in them, their heirs and assigns for ever. The personal estate thus noticed, to pass as a continual stream. After my widow's decease, I direct that the principal sum of five thousand dollars be equally divided among all of my heirs, or their lineal heirs, as the case may require."

He further provided that the bequest to his widow should be in

lieu of her dower.   He appointed his sons, Rev. James Rush An-
derson, Joseph Wilson Anderson, Andrew Jackson Anderson, and
John Fletcher Anderson, his executors, to all of whom letters
testamentary were granted on the 23d July 1858.   The testator
left surviving him a widow, Mary W. Anderson, the appellant, and
issue by her five children; also four children the issue of a former
marriage, and three grandchildren, the issue of a deceased son by
the former marriage.   The Rev. James Rush Anderson, one of
the executors, was a son of the testator by his first wife; the other
three executors were the issue of the second marriage.

On the 21st August 1858, an inventory and appraisement was
filed, amounting to $92,901.56; and on the 17th March 1859, the
executors filed a settlement of their accounts in the register's
office, exhibiting a balance in their hands of $90,495.88.

About the 14th of October 1858, Mrs. Anderson applied to her
son Andrew J. Anderson, one of the executors, for information in
regard to the estate of her husband, wishing to know the amount,
and asked him whether she had not a right to her dower or thirds.
He told her that she had.   She then requested him to see to it
for her, and attend to her business.   He told her in reply that
she had better employ counsel.   He then, at her request, called
on D. H. Mulvany, and stated to him her wishes, and Mr. Mul-
vany prepared a notice in writing to be signed by her, and to be
served on the executors.   The notice was in the following form:—

"To James R. Anderson, Joseph W. Anderson, Andrew J.
Anderson, John F. Anderson, executors of the last will and testa-
ment of Dr. James Anderson, deceased:

"In regard to the said last will and testament of my late hus-
band, Dr. James Anderson, deceased, you are hereby respectfully
notified, that I will not accept the devise or bequest made to me
under the said will, in lieu of dower, but that I will elect to waive
such devise or bequest, and take my dower in the estate of the
said testator, agreeably to the Acts of Assembly in such case
made and provided, and you will please, therefore, govern your-
selves accordingly.
                "Yours truly,
                              "MARY W. ANDERSON."

After this notice had been prepared, Andrew J. Anderson
requested his mother to delay having it served on J. Rush Ander-
son, until he, Andrew, could procure some papers from Philadel-
phia, which he wanted; the notice was delivered to Rush on the
19th January 1859.

On the 7th June 1859, upon the petition of Andrew J. Ander-
son, the Orphans' Court of Montgomery county awarded a citation
against the said Mary W. Anderson, commanding her to be and

appear in the said court on the 15th August then next ensuing, to make her election either to accept the devise or bequest made to her in the will of her husband, in lieu of dower, or to waive such devise or bequest and take her dower agreeably to the Act of Assembly, in such case made and provided. And on the 25th June 1859, Mrs. Anderson appeared in open court (*waiving the benefit of further time*), and desired to decline and refuse to accept the devise or bequest made to her in and by the will of her husband, in lieu of dower, and to elect to waive such devise or bequest, and to take her dower in the estate, real and personal, of the testator, as in the case of an intestacy ; and asked that a record should be made accordingly, agreeably to the Act of Assembly, in such case made and provided.

John Y. Crawford, the guardian of the minor children of Isaac W. Anderson, deceased, Sarah P. Fisher and Naomi Anderson, legatees under the will, thereupon came into court and submitted a paper in writing, signed by them, in which they protested against the election of the widow to take her dower or thirds, alleging that she had previously, in fact and in law, made her election to take the devise and bequest under the will, and entered into the possession and enjoyment of the same, and was thereby estopped from claiming her dower or thirds in the estate.

The court, thereupon, suspended further proceedings, and appointed an auditor to report upon the facts of the case, and also to distribute the balance of the personal estate in the hands of the accountants.

Before the auditor, it appeared that the testator, at the time of his decease, resided on his farm, with his family, consisting of his wife, his son John Fletcher Anderson, and two minor children. After his decease, the widow remained in the house, but did not interfere in any way with the management of the farm, which was attended to by John Fletcher Anderson, one of the devisees and executors.

On the 2d October 1858, Mary W. Anderson, the appellant, signed the following receipt, the body of which was in the handwriting of Rev. J. Rush Anderson :—

" Received, August 5, 1858, from the executors of the last will and testament of James Anderson, deceased, two thousand one hundred and nineteen $\frac{50}{100}$ dollars, the value of all the personal and movable property pertaining to the lands and buildings in Montgomery county, as returned this day in the appraisement.

" $2119.50.                              MARY W. ANDERSON."

On the 23d October 1858, she gave another receipt, also in the handwriting of Rev. J. Rush Anderson, as follows :—

[Anderson's Appeal.]

" Received, October 23, 1858, of J. R. Anderson, one hundred dollars, interest for four months on my legacy from the estate of Dr. James Anderson, deceased.

"MARY W. ANDERSON."

A short time prior to the 2d October 1858, Mr. William H. Wilson, resident engineer of the Philadelphia Division of the Pennsylvania Railroad, held a conversation with Rev. J. Rush Anderson, on the subject of having a small portion of the Anderson farm (about 20 feet square) for a railroad station; and afterwards addressed to him a note on the subject, to which J. Rush Anderson replied, under date of October 2d 1858, saying that he had spoken to the family with regard to the station-house, and that they were perfectly willing that the company should put up a building of the size spoken of, at the place designated, and occupy it for twenty years or less, and adding, " if the company wish to secure themselves by a lease, Mrs. Mary W. Anderson and John F. Anderson will be the proper persons to sign it. There is also a younger brother, a minor, interested, but no difficulty need be apprehended from him. He now gives his full and entire consent." On the receipt of this letter, Mr. Wilson addressed a letter to Mrs. Mary W. Anderson, dated November 6th 1858, enclosing her a copy of a resolution of the board of directors, approving of the proposed arrangement for a station, and in which he said: " Having understood from the Rev. J. Rush Anderson, that the terms proposed would be satisfactory to the family, and that yourself and John F. Anderson would sign a lease (it is better that there should be a written lease to prevent any misunderstanding hereafter), I have accordingly drawn up one, which I herewith enclose, and which I hope will meet your approbation."

An article of agreement was thereupon executed between Mary W. Anderson and J. F. Anderson of the one part, and W. H. Wilson, resident engineer, of the other part, bearing date the 8th day of November 1858, whereby a piece of ground, twenty feet front on the railroad by twenty feet in depth to Anderson's lane, was leased to the company, for the purpose of having erected thereon a frame building, to be used as a station-house for passengers, to be called " Athensville," for the term of twenty years, at a rent of one dollar per annum.

On the 11th April 1859, Rev. J. Rush Anderson wrote another receipt for Mrs. Anderson, which she signed, as follows:—

" Received, April 11, 1859, from J. R. Anderson, one hundred and fifty dollars, on account of interest from the estate of my deceased husband.

"MARY W. ANDERSON."

[Anderson's Appeal.]

The auditor reported that the widow had accepted the provisions of her husband's will, and proceeded to make a distribution of the fund in the hands of the executors. To this report, the widow filed exceptions, which were overruled by the court below, and the following opinion was delivered by SMYSER, P. J. :—

"The material question to be determined is, whether the widow has made her election to take under the will. Has she done such acts as determine her election, and preclude her now from claiming her statutory dower in her husband's estate? There is no pretence that she has done so expressly, or in the form and manner pointed out in the statute. But this is not necessary, although it is undoubtedly better that the statute should be pursued in all cases, to prevent controversy and disputes. Her election may be made *in pais*, either expressly, by an explicit declaration, or impliedly, by unequivocal acts indicating such an intention: Light *v.* Light, 9 *Harris* 412, and the case of Kauffman *v.* Kauffman there referred to.

"In order to bind her on the ground of an *implicit*, in the absence of an *explicit* election, it is necessary that the acts relied on as constituting such election should be done by her with knowledge of the material and necessary facts to enable her to make her election understandingly, and with the intention, at the time, to submit to and acquiesce in the arrangements of the will. An act done inadvertently, with no such intention, or without knowledge, or the means of knowledge, of the essential facts of the case, although involving an apparent acceptance of a benefit under the will, ought not to bind her, and may be revoked on her making restitution. Mere ignorance of the law, however, will not relieve her from the effect of acceptance under the will, unless her ignorance has been wilfully and fraudulently abused by the other party. If imposition has been practised by one who knows the law and is aware of her ignorance, she ought to be relieved. In the absence of anything of the kind, she is both bound and presumed to know the law, and acts at her peril. These are all the principles material to the determination of the question here, and are so fully set forth in the latest case we have on the subject, that of Light *v.* Light, that I deem it unnecessary to refer to any other authorities.

"Now, to apply them to the facts of the present case. The widow has done quite a number of acts relied on as determining her election, and which, as far as the question of her intention is concerned, must be considered collectively, and not merely as to their effect, isolated from one another.

"First. Her husband, the testator, died on the first of June 1858. The widow has continued to reside on the mansion-farm and in the mansion-house ever since, occupying and using it, in

the manner described by the witnesses, and set forth by the auditor in his very lucid and able report. The testator, by his will, devised as follows: (The learned judge here cited the provisions of the will.)

"Her son, John Fletcher, has been residing with her on the premises, apparently occupying and managing it either jointly with her, or under her direction. They have sold produce, cut and sold timber, pulled down and erected buildings, leased a portion, and done many other acts indicative of dominion and ownership. That in these acts, John Fletcher was not acting as one of the executors of the will, is apparent from the fact, that in the executors' account, since filed by himself jointly with the other executors, no account is taken of the proceeds, nor any credits claimed on any of these transactions. Nor does it appear that he contracted, paid or received money, or gave or took receipts on account of any of them, in his representative capacity.

"By the statute of 9 Henry III., ch. 7 (reported by the judges to be in force *quoad hoc* in Pennsylvania), the widow has her quarantine in her husband's principal mansion; but her legal right of occupancy, save as a tenant yielding and paying rent, extends no further. She cannot even enter upon her portion, until it be legally assigned to her by due course of law; and if she has entered, the heir or devisee may recover against her in ejectment without assigning dower: Evans *v.* Webb, 1 *Yeates* 424; Jones *v.* Hollopeter, 10 *S. & R.* 328. When, therefore, we find her, conjointly with the very persons to whom, in case of acceptance under the will, she is directed to rent the property, thus in the permanent occupancy of the premises, long after her quarantine had expired, in the pernancy of the profits without rendering any account therefor, it affords a fair ground of inference that such continued use, occupancy, and enjoyment by her is under and subject to the will, and is a circumstance indicative of her intention to accept the provisions made by it in her favour, even if it is not such an act as would determine her election. We must presume that she meant to act according to law, and the cases last cited show that, before assignment, she could neither recover or defend the possession on her mere right of dower.

"It is said that, as to the lease of a portion of the ground to The Pennsylvania Railroad Company, for twenty years, for a passenger station, the widow ought not to be affected by it, inasmuch as it argued, from the letters of J. Rush Anderson, one of the sons and executors, and who negotiated the arrangement, that the *family* were consulted, and that it was a *family* arrangement. But, are we to understand from the expression used in the letter of J. Rush Anderson to Mr. Wilson, the engineer, under date of October 2d 1858, that he had spoken to *all* the numerous members of Dr. Anderson's family 'yesterday,' at their several places of

abode; or was it the 'family' occupying the premises of which a portion was to be leased?—in other words, Mrs. Mary Anderson, the widow, and her son. It must be borne in mind that, at that time, Mrs. Anderson had, by no act or expression of hers, given her son, the Rev. J. Rush Anderson, or anybody else, any reason to doubt that she intended to hold under the will; whilst her conduct and acts, her continued occupancy in the manner above referred to, and her receipt to the executors, *on the very same day that the letter was written,* for the personal property specifically bequeathed, gave him and every one else grounds for expecting and believing that it was her intention to stand by the will. Why, then, should J. Rush Anderson consult any other members of the *family*, as to the propriety of the proposed lease, than those who alone, on that understanding, were interested in it, and had any right to assent or dissent? the persons whom the writer of the letter, in a subsequent part, designates as the proper parties to sign the lease? and who would only be the proper parties on that hypothesis? Would the widow and J. Fletcher Anderson have otherwise taken the whole responsibility of making this long lease, without either requiring the other heirs, equally interested with themselves, to sign also, or to give them some evidence, by power of attorney, or otherwise, of their assent? We are warranted in concluding that none such was given, or it would have been produced. Do not the facts conclusively establish that, at that time, Mrs. Anderson became a party to the lease as devisee, and not merely as one of the family? Was the selection of the only member of the family who, with the exception of Ultimus, then a minor, had or could have any title to be consulted, if the will was to stand, accidental? Did they make themselves the only parties, under these circumstances, accidentally also? Surely this cannot be maintained with any show of reason.

"The next act of Mrs. Anderson, indicative of her election, is her receipt to the executors given on the 2d October 1858, but ante-dated to the 5th of August 1858, doubtless so as to make it correspond with the date of the inventory, in which she acknowledges to have received from them 'two thousand one hundred and nineteen dollars and fifty cents, the value of all the personal and movable property pertaining to the lands and buildings in Montgomery county, as returned this day in the appraisement.' If this receipt, as its terms seem to imply, was given in satisfaction of this specific bequest, and was given fairly and with knowledge, it is difficult to see why it is not an act of election. Surely Mrs. Anderson was not so stupidly ignorant, as to conceive that she could take this large bequest and her thirds also. In other words, that she could take under the will, and against the will, at one and the same time. On the contrary, she is, and is admitted to be, as intelligent as she is respectable; and the terms of her husband's

[Anderson's Appeal.]

will, with which she must have been acquainted, expressly informed her that the testamentary provisions contained in it in her favour were in lieu of her dower or thirds.   To impute to her, then, the design of appropriating this large amount of personal property under the will, and then to disclaim the will, is dishonouring to her, for it would imply a gross fraud on her part.   She must, therefore, have then contemplated taking under the will; and if, with such a design, she received this bequest, it was her election. Whether she is conclusively bound by it, or can afterwards retract her election by restoring the articles, I will hereafter consider.

" But her counsel contends that this receipt is not to be understood as being given in satisfaction of the legacy.   To get rid of its effect various explanations are given or suggested.   One is that it was nothing more than the ordinary case, such as is of every day's occurrence, as well in cases of testacy as of intestacy, of a widow taking such articles of personal property as suited her, at the appraised value, to be accounted for on distribution.   We think the terms of the receipt negative any such a construction, for they are precisely descriptive of the legacy, following the very words of the will in which the legacy is given.   It is also urged that, as the widow is not compellable to make her election until after the expiration of twelve months, she had a right to the possession of the articles of personal property bequeathed to her during that period, or until her election was made; that the law cast the possession or right of possession on her; and that, being so in possession, the receipt was a mere acknowledgment of the fact to relieve the executors.   But this is not the law.   The property in the goods was in the executors, from the time of the testator's death; and she could only acquire a right to their possession by acceptance of the bequest.   If she had them in her actual possession, however, the right of possession being in the executors, and they were disposed to let them remain, for the present, in her custody, it would be all very natural for her to give them some acknowledgment of the fact; but it would not be natural for her, as a mere custodian, to give a receipt in the unqualified terms of this.   Besides, John Fletcher, one of the executors, resided on the premises where the goods were, and was apparently as much in possession of them as she was.   His possession, therefore, rendered a receipt for any such purpose as the one last suggested unnecessary, and the widow would be changing what at most was her joint into her exclusive possession, with all its responsibilities, without any conceivable motive.

" But this is not all.   On the 23d of October, precisely three weeks afterwards, we find her giving a receipt to J. Rush Anderson, one of the executors, for $100, 'four months' interest on my legacy from the estate of Dr. James Anderson, deceased.'   The

[Anderson's Appeal.]

interest of her legacy of $5000 for four months, is precisely the sum receipted for. Here, then, at least, we have a distinct and unequivocal act of acceptance, in affirmance of the will, and which, if not liable to be impeached on any of the grounds already recognised, ignorance, inadvertence, fraud, &c., must bind her as an act of election, unless, indeed, it is revocable by her afterwards. It is the same, for all the purposes, as if she had received her whole legacy; for the cases recognise no distinction between acceptance of a part and the whole. What else could she intend but to stand by the will, when she gave the receipt? An intelligent woman, such as she is admitted to be, could not, in the face of the positive and clear expression of her husband's will to the contrary, have thought that she could take the legacy and her dower too. She must have known, that she was compelled to choose between the two, for her husband's will told her so. An upright, high-minded lady, such as she is, could not have meditated a fraud. What else, then, could she have had in view, but a recognition of the will, and an acceptance of its provisions? The testimony of Andrew Jackson Anderson leaves it in doubt, whether this was before or after their conversation in which she inquired whether she could not have her thirds, and instructed him to employ counsel for her. If it was *before*, it is an additional and very formidable barrier in the way of her success now in claiming her thirds; if *after*, then she did this act, at least, with full knowledge of her rights. That she, on the day this receipt was given, was satisfied with the will as it stood, and may therefore be reasonably taken to have made her election, is shown by the testimony of Lucy Wetherill.

"Next in order of time comes the lease to the Pennsylvania Railroad Company, of which I have already spoken, and which was in November 1858. Then, the notice to the executors of her intention to claim her thirds against the will. This was on the 19th of January 1859; and yet, on the 11th of April following, she receives $150 from J. Rush Anderson, one of the executors, and receipts for it, 'on account of interest from the estate of my deceased husband.' This is not expressed to be for 'interest' on account of her legacy; but the conclusion is an irresistible one that it was so in fact. The testator died 1st June 1858. Her interest on the $5000 commenced then. Such appears to have been the understanding. The previous payment of $100 paid the interest to 1st October. From that date to the 1st of April 1859, would be six months more; and that interest would be precisely $150. It is true, the interest was, according to the will, payable semi-annually, and, therefore, neither of these payments was made on the days it was legally demandable. But surely it is nothing strange or uncommon for a son, the acting executor of a large estate like this, amounting in personal estate alone, to near

$100,000, to accommodate a mother in this manner, regardless of the strict letter of a mere legal obligation.

"Could this receipt have been for anything else? It is for interest *eo nomine;* what interest had she to get in any other capacity than as a legatee? As the widow claiming adverse to the will, she had no interest *qua* interest to receive; and if this was intended only as evidence of her receipt of so much money on account of what would be coming to her under the intestate laws, it would not be according to usage, to receipt for it specifically as interest, but she would have receipted for so much money merely; or she would have said, if using the term *interest* at all, 'on account of *my interest* in the estate, &c.' She does not do so, but receives it and receipts for it specifically as 'interest' in its contradistinction to *capital* or *principal.* If this was, then, given and intended as a further receipt on account of the legacy to the widow, we can only relieve her from the attribution of bad faith, by supposing that, when she gave it, she had again changed her mind, and had concluded to stand to her original purpose to take under the will, and to retract her notice of the 19th of January; or by believing that her son, the Rev. J. Rush Anderson, had in some way practised upon her, and taken an undue advantage of her. One of her counsel, however, admits that he is of too high and pure a character to be capable of conduct so disreputable, and the other does not directly impute it.

"The question then arises, how long or often is the widow of a decedent to be permited to veer about before she becomes finally fixed? Having elected to take under the will, and then retracted her election, and then again retracted her retraction, shall she be permitted again to change her mind, and so on *ad infinitum,* or even during the twelve months allowed her for consideration? Surely the law, when it gave her a twelvemonth, did not mean to give her such a privilege as this, when her changeable purpose has been signalized by acts done and interests vested. All it meant was, that she should not be *compellable* to make her election under a twelvemonth; but if she chooses to waive part of the time, and elect sooner, she is to be bound by such election just as if it were made formally in court after the year had expired, unless she can show that she ought to be relieved on some of the grounds hereinbefore noticed, upon her making restitution or compensation. That she may not do so otherwise is clearly settled. If she enters on the property given her by the will, and enjoys it, she is barred of her dower: Jackson *v.* Churchill, 7 *Cowen* 288.

"At law, as well as in equity, a widow is held to her election; and whenever she has, by her acts, declared that election, and proceeded on it, she is deemed to have put an end to the counter claim: Van Orden *v.* Van Orden, 10 *Johns. R.* 32. That an election once made estops any other inconsistent claim, and is

irrevocable save for sufficient cause, is also established, I think, by our own cases. See Hamilton *v.* Buckwalter, 2 *Yeates* 389, where possession under the will was held, not only to *suspend*, but entirely to *extinguish* dower: also, Preston *v.* Jones, 9 *Barr* 460; Cauffman *v.* Cauffman, 17 *S. & R.* 16; Light *v.* Light, 9 *Harris* 412. In some of the cases, the act of acceptance was coupled with long acquiescence, or delay in challenging the inconsistent right. But surely that is not the *principle* of the decisions. Such a fact may make the evidence of election more strong and unequivocal; but, if the widow *intended* to elect, and did elect, and that appears, in any way whatever, with sufficient certainty, that is all that is required. Such fact, then, only goes to the *proof,* and not to the *principle* of the case.

"Is Mrs. Anderson entitled to be relieved from her election on any of the grounds aforesaid? And first, as to whether she made it in ignorance of what was necessary for her to know in order to elect fairly. I have already said, that mere ignorance of the law will avail nothing, because, being bound to know it, she is presumed conclusively to have known it. She, therefore, knew that, under the intestate laws, she was entitled to her dower in her husband's lands, and also to one-third of the personal estate, after the debts were paid; that she was not bound to accept the provision contained in the will, but had her choice between it and what she would have been entitled to if Dr. Anderson had died intestate; that she was not compellable to make such election before a year, although she might make it sooner if she saw fit; that such election might be signified by her acceptance under the will, and, once deliberately and understandingly made, would bind her; and that she had a right to require of the executors full information as to the nature, extent, and quality of the estate, and the debts against it, to compel such information through the aid of the Orphans' Court, and to delay her election until it was obtained. She knew, moreover, that she could not take, at once, both under the will and the statute of distribution, because the will (with the contents of which we cannot, without absolute stultification, suppose her to have been unacquainted) explicitly informed her that the devises and bequests to her were in lieu of her dower.

"So much in regard to her knowledge of her legal rights and position; and we discover not a particle of proof that she was circumvented or led to act as she did by any one having superior actual knowledge of the law. The only circumstance upon which even a surmise of the kind might be founded, consists in the fact that the several receipts signed by the widow are in the handwriting of J. Rush Anderson, one of the executors, and who, also, now resists his mother's claim to dower; but whether they were drawn and the money paid, and articles delivered at his instance and suggestion or at her request, does not appear; and the only

witness who could have given information, J. Rush Anderson himself, was, on her objection to his competency, excluded. It is conceded, however, by Mr. Fox, counsel of Mrs. Anderson, that he is beyond any suspicion or imputation of fraud or unfair practice; but the counsel asks us to discountenance the acts done and his agency therein, because, in another case, an unscrupulous man, disposed to take unfair advantages, might deceive or improperly influence the widow's action under like circumstances. It is enough to say that, when a case arises presenting the evil, it will be time enough to administer the remedy. We discover no principle of law or equity that would require us to visit a fair transaction with the consequences of fraud, because the agent in it might have played the rogue, but did not.

" Then, as to the degree and extent of Mrs. Anderson's knowledge of the facts of the estate when she did the several acts relied on as determining her election: We do not permit ourselves to doubt that she was acquainted with the amount and value of the personal estate, as set out in the inventory; for it is conclusively shown, that it was made in her presence, and with her knowledge, because she remarked to one of the appraisers, that she thought they were appraising the things in the house too high. Can it be supposed that, deeply interested as she was, and knowing, as she must have known, that her husband's estate was large, she would not look at the inventory to see what it came to, either before or after it was filed. She had all the knowledge or means of knowledge that the others had. She might have called for further information, if she felt that she required it, and could have compelled it if withheld; she did not call for it; she chose to act on the knowledge she had. There is no proof that the inventory did not exhibit the estate truthfully and correctly. There is no proof or allegation that she was either misled or mistaken as to the debts, and that its apparent value was thus affected or changed, and we think that her election, under those circumstances, ought to bind her: 9 *Harris* 409. We have been referred to 2 *Story's Eq. Jur.*, § 1098, 2 *McCord's Ch.* 280, 3 *P. Wms.* 124, and various other cases, to show that a widow is not bound to make her election until all the circumstances are known, and the condition and value of the estate are ascertained. Doubtless, this is so; and was the very object of extending the time of election to twelve months by our Act of Assembly. But, suppose she chooses to elect sooner, and it does not appear that the information under which she did so, was defective, incomplete, or incorrect; may she not do so? And should she not stand to it afterwards? May she play fast and loose, or make random experiments as often as she can, or may choose to do, during the year allowed her?

" Did she elect under a mistake? If so, it is neither alleged, pointed out, nor proved; and, surely, here at least, the burden of

proof is with her. We cannot be required to presume that she, in the particular instance, was mistaken, because others have been, and she, by possibility, might be. Was there fraud? That is disclaimed. Was there concealment? No such thing is proved or alleged. Was there persuasion or influence used to induce her to do what she did? We have searched the testimony in vain for any reliable evidence to warrant even that imputation. Are these things, because they *may* exist, and have existed in other cases, to be taken for granted in this case, until the other party prove a negative? That is not the rule of evidence.

"A number of cases, both English and American, have been cited, to show that acts done by a party before he or she is fully informed of his or her rights will not, generally speaking, amount to an election; and a reference to some of them may be found at the close of the note at the end of the case of Wake *v.* Wake, 1 *Vesey* 337. But then, it is presupposed, that the party will make use of the means of information he already has, and not close his eyes and shut his ears to that which lies before him. He is not to fold his hands passively, and oppose the *vis inertiæ* of stolid or wilful sloth, to the impulses which are operating to urge him forward to light and knowledge. The cases of Hendor *v.* Rose, and of Pusey *v.* Desbouvrie, cited from 3 *P. Wms.* 124 and 321, certainly do show, that before a party can be compelled to choose between two interests, he is entitled to have the accounts taken. But what if he will not apply for an account, but chooses to take the risk of acting in advance of, and without it? Surely, then, before he ought to be allowed to retract his election on such ground, he should show that there was some material difference between the supposed and the actual state of the accounts. To hold otherwise, would be to place vigilance at a discount, and negligence at a premium.

"A very elaborate and able argument was addressed to the court, and many authorities cited, to show that this being, at most, a case of implied election, the equitable doctrine of compensation applied, and that the widow might be relieved from the consequences of her acts of acceptance, by making restitution or compensation, and the widow, by her counsel, offered to make such compensation or restitution on the argument of the case.

"The correct view, I think, is this:—Where the election is explicit and express, there is no retraction, provided it is fairly and properly made. The equitable rule referred to has, in such a case, no room to operate; and this seems to be conceded. Now, why should not the same be the rule, in the case of a clearly implied election? It is the fact of election, and not the means or form of signifying it, that is regarded; and therefore, where the acts are done understandingly and fairly, and show a clear intention to elect, because they are inconsistent with any other

honest intent, the result ought to be the same as in the case of an express election.

"The cases cited from 1 *Vesey* 335, 4 *Beav.* 103, and from *Williams* and *Roper*, only show the general principle, which is not disputed, that the acts constituting the implicit election must be done understandingly and with intent to elect. What shall be sufficient to show such intent, in all cases, is not, and, from the nature of the case, could not, be laid down. There is no common measure or standard; there can be none. As is said in the note to Butricke *v.* Broadhurst, 1 *Vesey* 173, "these circumstances" (those which would bind a person to an election), "whether arising out of original intention, acquiescence in the acts of others, or the effects of acts of the party having the right of election on the interests of third persons, must be so infinitely varied and modified in different cases, that no rule applicable to all can be laid down; each must be determined on its own particular grounds;" and the same will be found in 2 *Roper on Legacies* 439. When, therefore, it is said in 2 *Bro. Ch.* 5, that a party who has received some benefit from the act of acceptance, but where there is no explicit election, may renounce the benefit and elect *e contra*, making compensation, it must be understood to mean those cases only where the implication is not equivalent to a direct choice, and the intention of the act is not fully and with sufficient certainty established; for, in Baney *v.* Killmer, 1 *Barr* 35, an election once made is, on the authority of 1 *Roll.* 726, said by GIBSON, C. J., to be irrevocable.

"In Fulton *v.* Moore, 1 *Casey* 476, there is a strong implication that a widow may not *in all cases* retract on the simple condition of compensation; for it is there said, doubtingly, that if the amount received by her was *small* in amount, or received by mistake, a chancellor would perhaps permit her, in a reasonable time, to refund it. Here the amount is large, nearly $2500; and, as we have seen, there is no ground for the suggestion of mistake. In Preston *v.* Jones, 9 *Barr* 471, the party electing was said to be for ever precluded by his acceptance; and see Baney *v.* Killmer, referred to above; and Share *v.* Anderson, 7 *S. & R.* 63. Moreover, in Fulton *v.* Moore, it is distinctly stated, that no relief will be granted against an act of acceptance, even on the basis of compensation, where it cannot be done without doing injustice to some party. In Tibbits *v.* Tibbits, 19 *Vesey Jr.* 662, 663, the rule is declared, that if the parties to be affected cannot be restored to their former situation, the election once made is binding, and cannot be retracted; also, in 2 *Roper on Legacies* 441; and that is precisely the predicament this case is in, for the lease to the railroad company, for twenty years, cannot be avoided without doing injustice to the company, unless they agree to it; nor, if it stands, does the widow surrender up

the property, of which she is now in possession, to the heirs, in the same condition in which she received it; and whatever may be the case in regard to the heirs and legatees, the railroad company, being a stranger to the will and the estate, and standing on the ground of an independent agreement, entered into since the decedent's death, is not within the scope of the chancery rule as to compensation to a disappointed or injured legatee or devisee. For these reasons we are of opinion that the acts done by the widow, previous to the citation, determined her election in favour of the will, and that it is now too late for her to come in and claim adverse to it.

" Believing that the points of law have been correctly decided by the auditor, and discovering nothing in the testimony that would justify us in overruling his finding on the facts, the. report is approved and confirmed, and distribution decreed according thereto.

" And the court do now also, to wit, on the 17th day of October, 1859, overrule, reject, disallow, and dismiss the demand and claim of the said Mary W. Anderson, widow and relict of Dr. James Anderson, deceased, to have her dower and distributive share in the estate, real and personal, of her said husband, and to decline and refuse the provision made for her in said will, on the ground that she had, previously to coming into court with such her demand and claim, elected to accept said testamentary devises and bequests in lieu of her said dower and distributive share; and that she, the said Mary W. Anderson, by sundry acts *in pais*, had signified and determined such her choice and election, and is legally bound thereby."

From this decree the widow took her appeal.

*G. R. Fox* and *Mulvany*, for the appellant.—It is said, the widow has waived her right to dower, and to her thirds of the personal estate, by an implied election, to be inferred from her acts and declarations. But to conclude the widow by such implied election, it must appear that she was informed of the relative values of the things she was to choose between: Pinckney *v.* Pinckney, 2 *Rich. Eq.* 237; that the circumstances necessary to a judicious and discriminating choice were ascertained: *Id.;* that she acted with a proper understanding of the consequence of her acceptance: Adsit *v.* Adsit, 2 *Johns. Ch.* 451; that she has done plain and explicit acts, with full knowledge of her rights: Melizet's Appeal, 5 *Harris* 454; that her acts were not done by inadvertence, without choice: Dillon *v.* Parker, 1 *Swanst.* 380; that she had full knowledge of the circumstances of the testator: Wake *v.* Wake, 1 *Ves. Jr.* 335; that she did actually intend to take under the will: *Story's Eq. Jur.*, § 1097; that she could make a discriminationg and deliberate choice, and that the choice she is

alleged to have made, is a judicious and sensible one : *Id.*, § 1098 ; that she could not restore the other persons affected by her claims to the same situation as if the acts had not been performed : *Id.*, § 1097 ; or that there has been such a lapse of time as ought to preclude the court from entering upon the inquiry : *Id.*, § 1097.

They also cited Clingan *v.* Mitcheltree, 7 *Casey* 36 ; Light *v.* Light, 9 *Harris* 406 ; Brown & Sterrett's Appeal, 3 *Casey* 62 ; Taylor *v.* Birmingham, 5 *Id.* 306 ; Seider *v.* Seider, 5 *Wh.* 208 ; Bishop's Appeal, 7 *W. & S.* 251 ; Hendon *v.* Rose, 3 *P. Wms.* 134, n. ; Pusey *v.* Debouvrie, *Id.* 315 ; Boynton *v.* Boynton, 1 *Bro. Ch. Cas.* 445 ; Kidney *v.* Coussmaker, 12 *Ves.* 136 ; Ardesoife *v.* Bennet, 2 *Dick.* 463 ; Reynard *v.* Spence, 4 *Beav.* 103 ; Gretton *v.* Howard, 1 *Swanst.* 435 ; Butricke *v.* Broadhurst, 3 *Bro. Ch. Cas.* 88 ; Duncan *v.* Duncan, 2 *Yeates* 302 ; Cauffman *v.* Cauffman, 17 *S. & R.* 16 ; 2 *Pars.* 148 ; 7 *Cranch* 370 ; 4 *McLean* 99 ; 4 *Cush.* 174 ; 1 *B. Mon.* 370 ; 2 *McCord* 280 ; 2 *Green* 505 ; 20 *Pick.* 556 ; 2 *Sandf. Ch.* 519 ; *Brightly's Equity* 65.

*B. M. Boyer*, for the appellees.

The opinion of the court was delivered by

READ, J.—Dr. James Anderson, of Lower Merion township, Montgomery county, died on the 1st day of June 1858, leaving a will bearing date the 22d of October 1856. The testator had been twice married, and left a widow and five children by her, and by his first wife, four children and three grandchildren, the children of Isaac W. Anderson, deceased, a son by the former marriage. He appointed his sons, James Rush Anderson, by his first wife, and Joseph Wilson Anderson, Andrew Jackson Anderson, and John Fletcher Anderson, by the second wife, his executors. The will was proved in the register's office, at Norristown, on the 23d July 1858, and letters testamentary were granted to all the executors. On the 5th August 1858, the personal estate of the testator was appraised, and an inventory filed in the register's office on the 21st of the same month, exhibiting an aggregate of $92,901.56.

By his will, the testator gave to his wife, during life, the interest of five thousand dollars, to be paid every six months ; also, during her life, the lands in Montgomery county, with all the movable and personal property pertaining to the lands and buildings thereon erected, "to be managed and used by her in the following manner : she first reserving, for her own convenience and comfort, what she may need ; the remainder of the real and personal to be rented by her to my two sons, John Fletcher and Ultimus Adjutor, or to either of them, as may be thought most advisable ; after their mother's decease, the title to the real and personal estate, above alluded to, to be vested in them, their heirs

and assigns for ever.   The personal estate thus noticed to pass as a continued stream.   After my widow's decease, I direct the principal sum of five thousand dollars to be equally divided among all my heirs, or their lineal heirs, as the case may require." These are the only devises and bequests to the widow, and in his fifth item he says, "my bequest to my widow is in lieu of dower," which is merely an affirmance of the 11th section of the Act of 8th April 1833, which saves her right of election which, by the 35th section of the Act of 29th March 1832, at any time after twelve months from the death of the testator, may be ascertained and fixed by proceedings in the Orphans' Court.

By the 11th section of a subsequent Act of the 11th April 1848 it is enacted: "The 11th section of the Act of 8th April 1833, entitled 'An act relating to last wills and testaments, shall not be construed to deprive the widow of the testator, in case she elects not to take under the last will and testament of her husband of her share of the personal estate of her husband, under the intestate laws of this Commonwealth, but that the said widow may take her choice either of the bequest or devise made to her under any last will and testament, or of her share of the personal estate under the intestate laws aforesaid." This provision, which was not understood at first even by lawyers, gave rise to considerable difference of opinion; but it is settled, that if she elects not to take under the will, she is entitled to one-third or one-half (as the case may be) of the personal estate, in the same manner as if her husband had died intestate.   The result in this case would be, if the widow has not elected to take under the will, she would be entitled to dower in all the lands of the decedent during her life, and to one-third of the personal estate absolutely.

The question then is, has she elected to take, under the will of her husband, the life-interests therein given to her ?  She certainly has not, by any proceedings in the Orphans' Court, made any such election, nor by any writing or paper, directly signified such to be her desire or intention.   The question, then, of implied election is one of an exclusively equitable character, and is governed by those equitable principles and rules which have been established for the protection of widows and other persons similarly circumstanced.   The Act of the 29th March 1832 gives the widow twelve months to make her election, and before the expiration of that time she cannot be called upon by any person or tribunal to say whether she will accept the devise or bequest in lieu of dower, or waive such devise or bequest and take her dower; and from necessity, the one-third or one-half of the personal estate is covered by this provision.   This is accomplished by a citation from the Orphans' Court to the widow, who is then called upon to make her election, of which a record is made, and which is conclusive on all parties concerned.

[Anderson's Appeal.]

In this case the widow was cited on the 7th June 1859, to appear on the 15th August next ensuing and make her election; and on the 25th June, in the same year, she appeared in open court (waiving the benefit of further time) and declined and refused the devise or bequest to her in the will of her husband, and elected to waive such devise or bequest, and to take her dower in the estate, real and personal, of the testator as in the case of an intestacy. We have, therefore, in due form of law, the absolute election of the widow, made at the time pointed out by the law, to take her dower, and her one-third of the personal estate of the testator. The burden, therefore, of proof lies on those asserting her prior election to take the devise and bequest, under the will, to make that out clearly and positively, and with a full knowledge, on her part, of her rights.

The inventory was taken on the 5th August, and filed on the 21st of the same month, and there is no evidence that the widow ever saw it or a copy of it, or knew its amount, and of what it was composed. As the inventory does not appear on the paper-book, we only know its total amount, $92,901.56, and not any of the items of which it consists. When, therefore, we look at the first piece of evidence which is introduced to prove a prior election by the widow, the receipt dated the 5th August, we do not know how it appears in the original instrument. We are obliged, therefore, to look only to the receipt itself. This receipt, it is acknowledged, is in the handwriting of J. Rush Anderson, and was not presented to nor seen by the widow until the 2d October 1858, although antedated nearly two months, and it clearly is not in conformity with the fact as alleged by the appellees. The receipt is for $2119.50; and it might, therefore, well be considered, by a person acting without legal advice, and depending entirely upon the good faith of her step-son, as a mere credit to the estate on account of her distributive share. At all events, it is ambiguous, and presents no clear idea to the mind of one thus circumstanced.

But we are relieved from all difficulty on this point, by the evidence of A. Jackson Anderson, her son and one of the executors, in relation to conversations with his mother, nearly contemporaneous with this transaction, in which she claimed her thirds or dower. About the 14th October, she got asking him about the estate, and whether she had a right to take her thirds, and he told her she had; then she wanted him to see to it for her, and attend to her business. He told her that she had better employ counsel. He called upon Mr. Mulvany and employed him for her, and stated to him her wishes; and Mr. Mulvany then sent her notices to be served on the executors; and then, at the proper time, she was cited to make her election. He (Jackson) told her, at the time she received the notices, not to serve the notice on Rush

until he got some papers from Philadelphia, which he wanted. The notice or notices, thus prepared and sent by the widow, were in the following form :—

"To James R. Anderson, Joseph W. Anderson, Andrew J. Anderson, John F. Anderson, executors of the last will and testament of Dr. James Anderson, deceased: In regard to the said last will and testament of my late husband, Dr. James Anderson, deceased, you are hereby respectfully notified that I will not accept the devise or bequest, made to me under the said last will, in lieu of dower, but that I will elect to waive such devise or bequest, and take my dower in the estate of the said testator, agreeably to the Acts of Assembly in such case made and provided; and you will please, therefore, govern yourselves accordingly.

      Yours, truly,       MARY W. ANDERSON."

Here, then, was a clear case of election by the widow, communicated at once certainly to one executor, and must have been known to the other, John Fletcher, residing in the same house where all these conversations, testified to by A. J. Anderson, took place, and which happened in the evenings when the family would be brought together. The receipt, therefore, of the 2d is entirely inoperative as an implied election to take under the will, in the face of a direct and positive election to take against it.

Against such a decisive election, slight implications, which can be compensated or arranged by passing the amount received to her claim of one-third of the personal estate, can have no effect, and this disposes of the receipt of one hundred dollars on the 23d October 1858, which is also prepared by and in the handwriting of J. Rush Anderson. It is to be observed that, by the will, the interest of the $5000 was to be paid half-yearly, and was not due until the 1st of December; and that the word legacy is improperly interpolated, for the interest itself was the legacy.

The next implication arises entirely from the conduct of J. Rush Anderson. This matter relates to the station at Athensville, on the farm of the decedent, and is clearly explained by the evidence of Mr. Wilson, the resident engineer of the Philadelphia division of the Pennsylvania Railroad, and the correspondence between him and J. Rush Anderson. Mr. Wilson spoke to Mr. J. Rush Anderson, and stated to him the object of his visit to Athensville, to wit, to get some ground for a station-house, and he gave Mr. Wilson his address, and Mr. Wilson said he would write to him, which he did, and received, in reply, a letter dated Philadelphia, October 2d 1858, in which he says he had spoken to the family, the day before, with regard to the station-house. "They are perfectly willing that the company shall put up a building of the

[Anderson's Appeal.]

size you speak of, and at the place you designate, and will permit the company to occupy the grounds for this purpose for twenty years or less." "If the company wish to secure themselves by a lease, Mrs. Mary W. Anderson and John F. Anderson will be the proper persons to sign it. There is also a younger brother, a minor, interested, but no difficulty need be apprehended from him. He now gives his full and entire consent." From this letter Mr. Wilson prepared the article of agreement, making John F. and Mary Anderson the parties of the other part. He signed two copies in presence of Mrs. Sharpless, and sent them by Mr. Sharpless; but Mr. Wilson never saw the widow at all.

Mr. Wilson wrote a letter to Mrs. Anderson, dated the 6th November 1858, giving a copy of the resolution of the Board of Directors of the Pennsylvania Railroad Company of the 13th October, accepting the arrangements made with J. Rush Anderson, and saying to her: "Having understood from the Rev. J. Rush Anderson, that the terms proposed would be satisfactory to the family, and that yourself and John F. Anderson would sign a lease (it is better that there should be a written lease, to prevent any misunderstanding hereafter), I have accordingly drawn up one, which I herewith enclose, and which I hope will meet your approbation." The agreement is dated 8th November 1858, and is between Mary W. Anderson and John F. Anderson and the Pennsylvania Railroad Company, and leases a piece of land 20 feet in front, and extending 20 feet in depth, to erect on it a frame station-house, for twenty years, at a rent of $1 per annum, with certain stipulations. It is signed by Mr. Wilson, as resident engineer. Now it is clear, that the whole matter was conducted and managed by J. Rush Anderson, and that the widow never saw Mr. Wilson, nor had anything to do with the correspondence between him and Mr. J. Rush Anderson.

Now what effect has this on the question of election? Not the least. The lease affected only one-half of the fee-simple at best, for, under the will, the minor had the other half; and if the widow declined to take under it, still she was a proper party, because she had a dower interest in the premises. In such case, it becomes questionable, whether the two devisees and legatees, John Fletcher and Ultimus Adjutor, were not the immediate owners of the lands in Montgomery county, together with all of the personal and movable property pertaining to the lands and buildings thereon erected.

There is nothing in the evidence showing that the widow ever worked or meddled with the farm or the personal property on it, for which she is said to have given a receipt. It was worked and managed entirely by John F. Anderson, for the benefit of himself and Ultimus Adjutor, as owners. It is true, their mother lived with them and attended to the dairy; but the farm is there and

all the personal property, for the benefit of whoever may be entitled to it.

On the 19th January 1859, the notice to the executors above stated was served on J. Rush Anderson (making certainly the second, and probably the third executor), the active agent in raising, by doubtful acts, an implied election on the part of the widow. This is simply a repetition of her former express election in October, or rather a communication of it to another executor. The account of the executors is filed on the 17th March 1859, and on the 11th April 1859, J. Rush Anderson pays the widow $150, and takes a receipt " on account of interest from the estate of my deceased husband," and this is called an implied election to take under the will, when the executor, paying the money and drawing the receipt, had been solemnly notified, nearly three months before, that she refused to do so, and elected to take against the will. If such a doctrine can be maintained, then it may be extended to such implications even after the final election is entered of record. It is clear, then, that in October certainly, she positively and distinctly made her election, which was communicated verbally, and in writing, to one, and perhaps to two of the executors, and reiterated in writing to a third executor three months afterwards, and finally put on record in the Orphans' Court on the 25th June 1859.

Has anything been done by her which cannot be restored or compensated for or arranged in the settlement of the account of her distributive share? The $100 and $150 paid her will be credited the executors (the lease has no bearing upon this question) and according as it may be settled, the personal property on the farm being in the possession of the specific legatees, they would be accountable to her for one-third of its value; and whether they would have to account to others for the balance, depends upon the question whether they are not entitled immediately to it.

An election by matter *in pais*, can only be determined by plain and unequivocal acts, under a full knowledge of all the circumstances, and of the party's rights. One is not bound to elect until he is fully informed of the relative value of the things he is to choose between; and if he make an election before the circumstances necessary to a judicious and discriminating choice are ascertained, he will not be bound. These positions are clearly sustained by all the authorities, and when applied to the present case, show conclusively how bald is the case of implied election, set up against the express election made by the widow in October 1858, and reiterated upon every proper occasion.

Under this simple view of the case, it is unnecessary to discuss the numerous authorities cited on both sides, or the learned opinions of the auditor and judge. In our view, a clear error has been committed in not applying to the facts of the case the known prin-

ciples of the doctrine of election, which is the creature of a court of equity, and is governed entirely by equitable rules. If such a case of implied election can be sustained, there is. not a widow that ever will be permitted to reach the end of the twelve months, without having her rights taken away, by a series of equivocal acts, done without any intention of electing, or even the idea being presented to her mind.

> And now, November 9th 1860, the decree of the Orphans' Court dismissing and disallowing the demand and claim of Mary W. Anderson, widow and relict of Dr. James Anderson, deceased, to have her dower and distributive share in the estate, real and personal, of her said husband, and to decline and refuse the provision made for her in said will, as also the decree of distribution, so far as the said distributive share of the said widow is concerned, are reversed; and it is declared, ordered, decreed, and adjudged that the said Mary W. Anderson did elect and hath elected according to law, to waive the devise and bequest to her in said will contained, and to take her dower in the estate of the said testator, and also her share of the personal estate of her said husband, under the intestate laws of this Commonwealth. And it is further ordered and adjudged, that the decree of distribution in the Orphans' Court, be so altered as to give to the said widow her one-third of the personal estate of the testator, deducting only such sums of money as have been paid to her on account of the same, according to the foregoing opinion; and with this alteration, the decree of distribution is confirmed.

LOWRIE, C. J., and STRONG, J., dissented.